## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| JASON SCALES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:18-cv-01652-LSC |
| | ) | |
| TMS INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

### I.     Introduction

Plaintiff Jason Scales ("Scales"), an African-American, brings this action against his former employer, TMS International, LLC ("TMS").  In Counts I and II of his Complaint, Scales asserts race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). In Count III, Scales asserts discriminatory discharge because of his race.  In Count IV, Scales alleges that he was subjected to a hostile work environment in violation of Title VII.

Presently before the Court is TMS's Motion for Summary Judgment (doc. 27).  The motion has been fully briefed and is ripe for decision.  For the reasons stated below, TMS's motion for summary judgment (doc. 27) is due to be GRANTED IN PART and DENIED IN PART.

## II.      Background[1]

### A. Scales's Employment at TMS

In July 2011, TMS hired Scales as a Crane Operator for the Nucor steel mill in Tuscaloosa, Alabama, for which TMS provides on-site, industrial mill services. In August 2014, Scales was promoted to the position of Operations Leadman/Shift Supervisor.   As a supervisor, Scales's job duties included supervising daily operation of his crew and responsibility for safety and maintenance standards on his shift.  TMS site manager Joe Burkey ("Burkey") was Scales's supervisor.

TMS had anti-harassment policies in place prohibiting any form of harassment or discrimination based upon race.  The policies were applicable to all hourly employees, including Scales.  In 2011 or 2012, Roger Parish ("Parish"), a white employee, allegedly called a black employee "Sambo."  Scales testified that he did not personally hear the comment but heard about it later from another employee.   Additionally, in approximately 2013, an employee named Steven

---

[1]      The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record.  These are the "facts" for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).  The Court is not required to identify unreferenced evidence supporting a party's position.  As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties.  *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .").

allegedly was called "mutt" because of his biracial baby, which Scales also learned about later but did not personally hear. Scales also testified that many employees wore T-shirts with rebel flags at work, the most recent occasion being in Scales's last month of work at TMS. Finally, there was an incident in which Collette, a white female, allegedly locked Lametrius, the only black female employee, out of the bathroom and forced Lametrius to use the port-a-john outside with the workers. This incident prompted Burkey to call a meeting to discuss race discrimination. According to Scales, TMS held "many meetings . . . to address the continuing racial incidents that occurred." (Doc. 34 at 39.)

In August 2017, Scales approached Burkey and complained that he was not getting the same help that another white shift supervisor had. According to Billy Brown ("Brown"), a black supervisor who was present during the conversation, Burkey became irate, screamed at Scales, and told him he didn't run the place. Scales testified that he voluntarily stepped down from his shift supervisor position because he did not have the help that other shift supervisors had. He explained that he could not work equipment and run the shift at the same time, so he went back to working the equipment. After stepping down, Scales operated both locomotives and cranes, and he sometimes filled in as supervisor if the normal team lead called off.

### B. The Larry Humphries Incident

In June 2017, TMS employee Larry Humphries ("Humphries"),[2] a white truck driver, referred to a piece of equipment as "nigger-rigged" in the presence of several other employees, two of whom were black. Humphries was an hourly employee subject to TMS's anti-harassment policies, and Burkey was his supervisor. After "a lot of people" complained about it, TMS commenced an investigation. (*See* Pl. Dep. at 62–63.) During an investigatory interview, Humphries told Burkey that he had not realized that the term "nigger-rigged" was offensive. Humphries's co-workers who heard the term allegedly confirmed to Burkey that they did not believe Humphries meant to offend anyone and that Humphries appeared ignorant as to the term's meaning. Humphries subsequently told some other employees about the investigatory interview, and he used the term "nigger-rigged" again while discussing the incident.

Burkey concluded that Humphries had used the term to refer to a repair job and not an individual; that he did not understand the meaning of the term; and that he had not intended to offend anyone by his use of the term. Burkey also observed that Humphries discussed the incident with other employees and used the term

---

[2]     It appears to the Court that this employee's name is spelled multiple ways throughout the parties' briefs as well as the deposition transcripts. For consistency, the Court will refer to him as "Humphries" throughout this Opinion.

"nigger-rigged" again, "which does not show complete remorse and understanding of the situation." (Doc. 29-2 at 81.) Burkey suspended Humphries for three days and told him that he would be terminated if he violated TMS's anti-harassment policy again.

### C. The Note and Investigation

On October 10, 2017, a handwritten note reading "Niggar get out" was found posted inside a TMS safety trailer on a supervisor's door. The note appeared to be written with a Sharpie marker. Burkey immediately began an investigation to determine who had written the note. He reviewed security footage of the area around the building, but the note could not be seen by any of the cameras. He also held meetings with TMS employees and Nucor personnel to discuss the incident and reiterate the anti-harassment policy. During one such meeting the day the note was found, Burkey stated that TMS does not tolerate "racial slurs or anything racial." (Pl. Dep. at 99:5–6.) Scales got upset and complained that Burkey's statement was not true because of how TMS responded when Humphries used a racial slur. After expressing how he felt about the note, Scales left the meeting early.

TMS Vice President of Human Resources John Carroll ("Carroll") came from Pennsylvania to assist in the investigation of the note. Carroll held meetings

with all TMS personnel to discuss the incident, reiterate the anti-harassment policy, and discuss any other complaints of racial discrimination that might exist. He also met with TMS employees on an individual basis.  Brown told Carroll there were racial issues in the maintenance department in that repair requests were being completed for white operators before black operators.  Carroll investigated the alleged racial issues, spoke with maintenance department employees, and addressed the concerns with the maintenance supervisor and operations supervisor.  Carroll's investigation concluded that repair requests were prioritized by business necessity with machines needed more urgently by the mill getting repaired first, and that race played no part in the prioritization.  Another TMS employee, Warren Griffin ("Griffin"), who is black, told Carroll that an unidentified group of employees wanted "YANKEE Joe" Burkey thrown out of the mill because he was from the North and was trying to break up the "good-ole-boys club."  (*See* doc. 32-30 at 3.)  Carroll's investigation concluded that this was a rumor with no basis in fact.  Carroll's investigation report also states: "We are convinced there is a small group of workers who are working together to create and incite situations that create a hostile atmosphere with an underlining [sic] tone of racism."  (Doc. 32-30 at 6.)  Carroll clarified in his deposition that the "small group" was the group that wanted Burkey thrown out of the mill.

After its own investigation failed to identify the author of the note, TMS hired Steven Drexler ("Drexler"), a forensic handwriting examiner, to analyze the note and compare it to TMS employees' writing samples.  Burkey communicated and coordinated with Drexler during the investigation.  On October 17, 2017, Burkey provided Drexler with handwriting samples from fifteen initial suspects, including Scales.  The initial suspects were employees who were known to be in the area of the note before it was found, employees who were seen in security video near the note, and employees who had used a Sharpie marker on the morning of October 10.  On October 18, 2017, Drexler allegedly called Burkey and told him that he believed Scales wrote the note.  During this phone call, Drexler asked Burkey for more handwriting samples from Scales to ensure that his initial analysis was correct, which Drexler claims is normal procedure.  On October 18, 2017, Burkey sent Drexler additional samples of Scales's handwriting.

On October 19, 2017, Drexler e-mailed Burkey a draft of his report. Drexler's e-mail asked Burkey to respond with comments or questions, to which Burkey responded that he would share with Carroll and be in touch.  The draft report identified employee handwriting samples as Items K1 through K15, Scales's sample as Item K12, and the note as Item Q1.  One section of the draft report states that "the Item Q1 writing was probably written by the author of the Jason Scales

handwriting standard." (Doc. 32-14 at 2.) Another section, however, reads: "Comparisons of the Item Q1 anonymous writing to the Items K1 thru K15 known handwriting standards of possible writers revealed that *all but writer K12* exhibit general *consistencies* with the anonymous writing." *Id.* (emphasis added). Drexler testified that the use of the word "consistencies" was a typo that should have read "inconsistencies." However, Drexler also refused to testify that portion of his report is incorrect.[3]

On October 20, 2017, Burkey called Scales in for a meeting. Carroll was not physically present but attended via speakerphone. In the meeting, Carroll suspended Scales pending the completion of the investigation. He explained that Scales was suspended because Drexler's investigation concluded that he wrote the note. Scales denied writing it and asked if there was anything he could do to prove his innocence. Carroll responded, "You can't."[4] The same day, Burkey gave Scales a disciplinary report explaining that he was suspended for violating the anti-harassment policy. On October 24, 2017, Drexler received additional handwriting samples for all employees on shift at the time the note was found to confirm that he correctly identified Scales as the note's author.

---

[3]   "I'm not going to say it's incorrect. . . . I'm saying it's a typo." (Drexler Dep. at 58:22–59:2.)

[4]   Carroll does not dispute that this conversation took place.

On October 27, 2017, Scales was terminated. Burkey administered the termination, but Carroll claims he made the final decision. Scales's disciplinary report, signed by Burkey, stated that he was terminated for violating the company harassment policy and general safety and work rules. Carroll testified that Scales violated the harassment policy because of the allegation that he wrote the note. Carroll further testified that the general safety rule Scales allegedly violated was the harassment policy by writing the note and that Scales committed no other violations. It is undisputed that all versions of Drexler's report used at the time of Scales's termination contained the statement that all but Scales's handwriting sample was consistent with the note—in other words, that Scales's handwriting sample was inconsistent with the note. On November 1, 2017, Drexler issued his final report, which still contained the statement that Scales's handwriting sample was inconsistent with the note.

## III.    Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact[5] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson*

---

[5]    A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1049 (11th Cir. 2015).

*Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine

dispute as to a material fact exists "if the nonmoving party has produced evidence

such that a reasonable factfinder could return a verdict in its favor." *Greenberg v.

BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v.

Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge

should not weigh the evidence, but determine whether there are any genuine issues

of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

249 (1986).

   In considering a motion for summary judgment, trial courts must give

deference to the nonmoving party by "view[ing] the materials presented and all

factual inferences in the light most favorable to the nonmoving party." *Animal

Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015)

(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However,

"unsubstantiated assertions alone are not enough to withstand a motion for

summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir.

1987). Conclusory allegations and "mere scintilla of evidence in support of the

nonmoving party will not suffice to overcome a motion for summary judgment."

*Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young

v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for

summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## IV.    Discussion

Absent direct evidence of racial discrimination or retaliation, such as specific statements made by the employer's representatives, a plaintiff may demonstrate circumstantial evidence of disparate treatment through the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).[6] Under this framework, the aggrieved employee creates a presumption of unlawful discrimination by first establishing a *prima facie* case of discrimination. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc). The burden

---

[6]    Because Scales has not offered any direct evidence of discrimination, the Court addresses his claims under the standards applicable to circumstantial evidence of discrimination. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).

then shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221 (citing *Burdine*, 450 U.S. at 253). If the employer proffers a legitimate, nondiscriminatory reason, the burden returns to the employee to prove that the employer's reason is a pretext for unlawful discrimination. *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008). Although the *McDonnell Douglas* framework is one way of showing discriminatory intent, it is not the only way to show discriminatory intent in a Title VII discrimination claim. *See Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

## A.   Race Discrimination

### 1. *Prima Facie* Case

Scales argues that he was discriminated against based on his race when TMS terminated him in October 2017. To establish a *prima facie* case for wrongful termination, a plaintiff must show: (1) he is a member of a protected class, (2) he was qualified for the position from which he was terminated, (3) he was terminated, and (4) he was treated less favorably than similarly situated individuals outside his protected class. *See Lewis*, 918 F.3d at 1221. To satisfy the fourth prong of the

*prima facie* case, the proffered comparator must be similarly situated to the plaintiff "in all material respects." *Id.* at 1226.

It is undisputed that Scales is a member of a protected class, that he was qualified for the position from which he was terminated, and that he was terminated. TMS contends that Scales has failed to satisfy the fourth prong because his alleged comparator, Humphries, is not similarly situated. Scales argues that Humphries, a white employee who was suspended for three days for using the "n" word, is a proper comparator.[7] TMS argues that Humphries and Scales are not similarly situated "in all material respects" because Scales was a supervisor and because the two employees engaged in materially different conduct. As the Eleventh Circuit has explained, "a valid comparison will turn not on formal labels, but rather on substantive likenesses." *Id.* at 1228. While the precise "similarity" is "to be worked out on a case-by-case basis," a similarly situated comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; "will have been subject to the same employment policy"; "will ordinarily (although not

---

[7] Scales also suggested that Parish, who allegedly called a black employee "Sambo," and unnamed employees who wore rebel flag T-shirts at work were treated more favorably because they were not punished at all for their alleged misconduct. TMS argues that Scales cannot introduce comparators for the first time in opposition to summary judgment. The Court concludes that none of these individuals are proper comparators because Scales has not produced evidence that they are similarly situated "in all material respects." *Id.* at 1226.

invariably) have been under the jurisdiction of the same supervisor"; and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28.

Here, Scales has shown that he and Humphries are similarly situated "in all material respects" for purposes of satisfying his *prima facie* case. First, both Scales and Humphries were hourly employees subject to the same "zero tolerance" anti-harassment policy. Further, both Scales and Humphries allegedly used a racial slur involving the "n" word at the workplace. TMS's attempts to distinguish the two uses of the slurs may be relevant at later stages of the burden-shifting framework, but their misconduct is not so materially different as to prevent Scales from satisfying his *prima facie* case. Moreover, according to the record, Burkey was supervisor to both Scales and Humphries, and Burkey administered and was involved with the discipline for both employees concerning their respective uses of the racial slur. Although TMS contends that Scales's supervisory status makes him not similarly situated to Humphries, Scales testified that he had stepped down from his supervisory position in approximately August 2017 to be a locomotive operator. Scales clarified that after relinquishing the supervisory role, he was doing two jobs—operating cranes and locomotives—and occasionally still filled in as supervisor. Therefore, there are issues of material fact as to Scales's status as a supervisor when he was terminated. Neither party discussed or cited to any

evidence about Humphries's employment history aside from his being a truck driver. Accordingly, viewing the evidence in the light most favorable to Scales, a reasonable jury could conclude that he and Humphries were similarly situated in all material respects. That Scales had spent three years as a supervisor and still occasionally filled in as one does not compel a different conclusion at the *prima facie* stage.

For the reasons explained above, Scales has satisfied his *prima facie* case and created a presumption that TMS discriminated against him based on his race.

### 2. Legitimate, Nondiscriminatory Reason

Once the plaintiff makes out a *prima facie* case, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 253). The burden at this stage "is exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). It is merely a burden of production, not a burden of proof. *Id.*

TMS has articulated a legitimate, nondiscriminatory reason for its decision to terminate Scales. Specifically, TMS states that it terminated Scales "based on Drexler's independent expert opinion" that Scales wrote the note. (*See* doc. 28 at 26.) Therefore, TMS has satisfied its burden of production.

### 3. Pretext

Once the employer articulates a legitimate, nondiscriminatory reason for its decision, "the burden shifts back to the plaintiff to produce evidence that the employer's proffered reason [is] a pretext for discrimination." *Alvarez*, 610 F.3d at 1264. "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence,'" *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Burdine*, 450 U.S. at 256), such that a rational trier of fact could disbelieve the employer's proffered nondiscriminatory reason, *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). "When a plaintiff chooses to attack the veracity of the employer's proffered reason, '[the] inquiry is limited to whether the employer gave an honest explanation of its behavior.'" *Kragor*, 702 F.3d at 1310–11 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). A *prima facie* case plus sufficient evidence of pretext may permit the factfinder to find unlawful discrimination, making summary judgment inappropriate. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

Scales has proffered evidence that TMS's nondiscriminatory reason for terminating him is unworthy of credence. "[A] plaintiff is entitled to survive

summary judgment[] . . . if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).  First, a reasonable jury could disbelieve TMS's explanation that it terminated Scales because of Drexler's expert opinion because all versions of the written opinion contained language exonerating Scales, i.e., the statement that Scales's handwriting sample was inconsistent with the note.[8]  Although the report also contains statements inculpating Scales, the existence of conflicting statements implies that one of them is incorrect.  Additionally, although Drexler testified that he also verbally told Burkey that Scales wrote the note, neither Burkey nor Carroll testified that they relied *only* on Drexler's verbal report or that they did not read the written versions in reaching the decision to terminate Scales.  Based on Drexler's deposition testimony and the e-mails attached as exhibits, it appears that Burkey read, commented on, and shared drafts with Carroll.[9]

Moreover, although Drexler testified that the exculpatory statement contained a typo, he also refused to testify that portion of his report is incorrect.

---

[8]     Scales maintains that he did not write the note and extensively argues that another employee, River Boothe, was the more likely culprit.  But the relevant inquiry for the Court is not whether Scales is actually innocent, but whether TMS's asserted belief in Drexler's report is worthy of credence.  *See Elrod*, 939 F.2d at 1471.

[9]     For example, Burkey responded to an e-mail from Drexler containing a draft report that he would share with Carroll and be in touch.

Even if it was "just a typo," it would not change the Court's analysis. What matters is the report's contents at the time TMS allegedly relied on it to make the decision to terminate Scales. Because all versions of the report contained a statement that Scales's handwriting sample was inconsistent with the note, a reasonable jury could disbelieve TMS's claim that they relied on it to terminate him. Moreover, even assuming that it matters whether it was "just a typo," Drexler's refusal to say that the statement was incorrect despite his claim that it contained a typo is puzzling. Therefore, viewing the evidence and all reasonable inferences in the light most favorable to Scales, a reasonable jury could conclude that TMS's reliance on Drexler's opinion is unworthy of credence. *See Elrod*, 939 F.2d at 1471.

This case is distinguishable from *Elrod*, where a plaintiff sued his former employer for age discrimination and the employer claimed that it fired him because his co-workers had accused him of sexual harassment. *Id.* at 1468. Before terminating the plaintiff, the employer conducted a Deficiency Interview and gave him a memorandum outlining the allegations against him, which he signed without objection. *Id.* at 1468–69. Even after the Deficiency Interview, co-workers lodged new sexual harassment allegations against the plaintiff. *Id.* at 1469. The employer interviewed the alleged victims and believed the charges of harassment. *Id.* at

1468–69.  In reversing the jury's verdict for the plaintiff, the Eleventh Circuit explained that while the plaintiff "may have convinced the jury that the allegations against him were untrue, . . . he certainly did not present evidence that [the employer's] belief in those allegations was unworthy of credence."  *Id.* at 1471. Unlike in *Elrod*, where there was no evidence that the alleged harassment victims made statements exonerating the plaintiff, Scales has presented evidence that all written versions of the expert report TMS allegedly relied upon contained statements exonerating him.  Moreover, unlike the *Elrod* plaintiff, Scales has always denied writing the note, including at the meeting in which he was suspended. Accordingly, Scales has presented evidence that TMS's belief in the report was unworthy of credence.

Because Scales has satisfied his *prima facie* case and proffered sufficient evidence of pretext, summary judgment is inappropriate on his race discrimination claim.  *See Reeves*, 530 U.S. at 148.[10]

## B.    Retaliation

Next, Scales claims that TMS's decision to terminate him was unlawful retaliation for his complaining about TMS's response to Humphries's use of a

---

[10]    Scales alternatively advanced a mixed motive theory for his race discrimination claim under *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016).  Because summary judgment is due to be denied under the ordinary *McDonnell Douglas* analysis, this Court need not address the mixed motive theory.

racial slur.  A plaintiff successfully establishes a *prima facie* case of retaliation if he demonstrates that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action.  *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).

It is undisputed that Scales was terminated, which constitutes an adverse employment action.  TMS argues that Scales cannot meet his *prima facie* case because he cannot show that he engaged in statutorily protected activity or a causal connection between that activity and the adverse employment action.  However, TMS presented this argument for the first time in its reply brief.  "Arguments not properly presented in a party's initial brief or raised for the first time in a reply brief are deemed waived."  *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009).

Even if TMS had properly presented its arguments in its initial brief, Scales has sufficiently shown that he engaged in statutorily protected activity for purposes of satisfying his *prima facie* case.  Scales testified that he complained to Burkey about Humphries's use of a racial slur and the subsequent discipline he received from TMS.  Title VII's protections plainly extend to individuals who communicate their belief that their employer's actions constitute unlawful employment discrimination.  *See Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310–11 (11th

Cir. 2016).  Scales has also sufficiently demonstrated a causal link between his protected activity and the adverse employment action.  One way a plaintiff can establish a causal connection is by showing that the employer knew of his statutorily protected activity and there was a close temporal proximity between this awareness and the adverse employment action.  *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("We have held that a period as much as one month between the protected expression and the adverse action is not too protracted."); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (stating that the temporal proximity must be "very close" and concluding that a 20-month delay was too long).  Here, Scales testified that he was terminated seventeen days after the meeting in which he complained about the Humphries incident.  Therefore, Scales has sufficiently shown a *prima facie* case of retaliation.

Having established a *prima facie* case of retaliation, the burden of production shifts to TMS to proffer a legitimate, nondiscriminatory reason for terminating Scales.  *See Brown*, 597 F.3d at 1181.  As stated above in Part IV.A.2, TMS's explanation for its termination decision—that Drexler's expert opinion concluded that Scales authored the racist note—meets this burden.  Accordingly, the burden shifts back to Scales to demonstrate that TMS's proffered reason is pretextual, which Scales may do by showing that the reason is unworthy of credence.  *See*

*Furcron*, 843 F.3d at 1313.  For all the reasons explained in Part IV.A.3, Scales has met this burden by showing that all versions of the written opinion contained language exonerating Scales, from which a reasonable jury could find TMS's alleged reliance on the opinion unworthy of credence.  Accordingly, because Scales has satisfied his *prima facie* case and proffered sufficient evidence of pretext, summary judgment is inappropriate on his retaliation claim.  *See Reeves*, 530 U.S. at 148.

## C.    Discriminatory Discharge

In addition to the race discrimination claim under Title VII (Count I), Scales's complaint also contains a Discriminatory Discharge claim in Count III. TMS did not independently address Count III in its summary judgment briefing. Additionally, Scales's response addresses Race Discrimination and Discriminatory Discharge under the same heading. Accordingly, it appears to the Court that Count I and Count III may be duplicative causes of action.  Nonetheless, summary judgment is due to be denied on Scales's Discriminatory Discharge claim in Count III because TMS did not make a separate argument aimed at Count III.

## D.    Hostile Work Environment

Finally, Scales brings a hostile work environment claim based on alleged racial harassment and disparate treatment.  A separate violation of Title VII occurs

when "the workplace is permeated with [racially] discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).  An employer can be held liable if the employee proves that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on the individual's membership in the protected class; (4) it was "severe or pervasive" enough to alter the terms and conditions of employment and create a hostile environment; and (5) the employer is responsible for this environment either directly or vicariously.  *Id.*  To meet the fourth element, the plaintiff must show that the conduct is both subjectively and objectively "severe or pervasive." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).  In evaluating the objective severity of the harassment, the court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250–51 (11th Cir. 2014) (citing *Mendoza*, 195 F.3d at 1246).

Scales claims that he was subjected to a hostile work environment based on the following: five incidents involving a racial slur (the note, Humphries's two uses of the term "nigger-rigged," the "Sambo" comment, and the "mutt" comment); his not getting the same tools and help as another white supervisor; Carroll's finding of a "hostile atmosphere with an underlining [sic] tone of racism"; Carroll's alleged failure to interview black employees or "dismissing" black employees' concerns without asking anyone during his investigations; other employees wearing T-shirts with rebel flags at work; and an alleged incident where Collette, a white female, locked Lametrius, the only black female employee, out of the bathroom and forced Lametrius to use the port-a-john outside with the workers.

Even construing the evidence in the light most favorable to Scales, no reasonable person in his position would perceive the alleged harassment as sufficiently severe or pervasive to alter the terms or conditions of their employment. The Eleventh Circuit requires more from the plaintiff to overcome summary judgment on a hostile work environment claim. *See, e.g.*, *Jones*, 683 F.3d at 1299–1301 (describing a hostile work environment based on ethnic slurs directed at the plaintiff, banana peels left in the plaintiff's vehicle, Confederate apparel worn by co-workers, and a confrontation between the plaintiff and several of these co-workers). According to Scales's testimony, the five racially charged comments at

TMS were isolated instances spanning a period of six years and, therefore, not pervasive. He also testified that he did not personally hear the alleged "Sambo," "mutt," or "nigger-rigged" comments, but instead learned about them later. Although the term "nigger" and other racial slurs is severe, they were not directed toward Scales or directly threatening to him. *Cf. Adams*, 754 F.3d at 1254–55 (reaching similar conclusion regarding plaintiff who overheard two racial slurs). Further, Scales testified that the most recent time an employee wore a rebel flag T-shirt was in his last month of work at TMS, suggesting that it was not a daily occurrence, and he has proffered no evidence that his exposure to the rebel flag was directly humiliating or threatening. *Cf. id.* at 1255 (reaching similar conclusion regarding a plaintiff who frequently saw co-workers wearing Confederate flag apparel). Scales makes no argument that any of these incidents unreasonably interfered with his job performance. Even when construed in his favor, none of Scales's remaining evidence[11] is sufficient to demonstrate that he faced severe or pervasive harassment that "alter[ed] the conditions of [his] employment and create[d] an abusive working environment." *See Jones*, 683 F.3d at 1292.

---

[11]   TMS objected to Scales's complaint that he did not get the same tools and help as another white supervisor on the grounds that Sales had testified at this deposition that this complaint was not related to race. However, even assuming it was related to race, Scales still has not demonstrated that he was subjected to a racially hostile work environment in violation of Title VII.

Because Scales has failed to proffer evidence from which a reasonable jury could conclude that he was subjected to a racially hostile work environment, his hostile work environment claim (Count IV) is due to be dismissed.

## V.        Conclusion

For the reasons stated above, TMS's Motion for Summary Judgment (doc. 27) is due to be GRANTED IN PART AND DENIED IN PART.  Scales's hostile work environment claim is DISMISSED WITH PREJUDICE.  All other claims remain pending.  An Order consistent with this Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on May 13, 2020.

L. Scott Coogler
United States District Judge

199335