# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | |
|---|---|
| JASON SCALES, | ) |
| Plaintiff, | ) |
| v. | ) 7:18-cv-01652-LSC |
| TMS INTERNATIONAL, LLC, | ) |
| Defendant. | ) |

**MEMORANDUM OF OPINION AND ORDER**

## I. Introduction

Plaintiff Jason Scales ("Scales"), an African-American, brought this action against his former employer, TMS International, LLC ("TMS"), alleging race discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and discriminatory discharge because of his race.  On May 13, 2020, this Court entered a Memorandum of Opinion and Order (docs. 46 & 47) (hereinafter "the summary judgment order") granting TMS's motion for summary judgment as to the hostile work environment claim but denying the motion as to the remaining claims. Presently before the Court is TMS's Partial Motion to Reconsider the summary

judgment order.  (Doc. 49.)  The motion has been fully briefed and is ripe for decision.  For the reasons stated below, TMS's motion is due to be denied.

## II.     Discussion

### A.     Similarly Situated Comparators

TMS moves for reconsideration of the Court's denial of summary judgment because it claims that Scales failed to establish a *prima facie* case for wrongful termination.  Specifically, TMS takes issue with the Court's conclusion that Scales had sufficiently demonstrated that he was treated less favorably than similarly situated individuals outside his protected class.  According to TMS, Scales's proffered comparators are not similarly situated "in all material respects."  *See Lewis v. City of Union City*, 918 F.3d 1213, 1226 (11th Cir. 2019) (en banc).  As the Court explained in its summary judgment order, "a valid comparison will turn not on formal labels, but rather on substantive likenesses," with the precise similarity "to be worked out on a case-by-case basis."  *Id.* at 1227–28.  The Eleventh Circuit's "guideposts" for this analysis provide that a similarly situated comparator "will have engaged in the same *basic* conduct (or misconduct) as the plaintiff"; "will have been subject to the same employment policy"; "will ordinarily (*although not invariably*) have been under the jurisdiction of the same

supervisor"; and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28 (emphases added).

In concluding that Scales and Humphries were similarly situated, the Court explained that, "according to the record, Burkey was supervisor to both Scales and Humphries, and Burkey administered and was involved with the discipline for both employees concerning their respective uses of the racial slur." (Doc. 46 at 14.) TMS insists that Humphries and Scales were not similarly situated because it claims John Carroll ("Carroll") alone made the decision to fire Scales, while Joe Burkey ("Burkey") alone made the decision to suspend Humphries. But as Scales points out, this argument relies in part on disputed facts, which must be construed in favor of Scales.

TMS also argues that Humphries and Scales engaged in materially different misconduct, thereby foreclosing the conclusion that they are similarly situated. In support of this argument, TMS cites two post-*Lewis* Eleventh Circuit cases, *Knox v. Roper Pump Co.*, 957 F.3d 1237 (11th Cir. 2020), and *Hartwell v. Spencer*, 792 F. App'x 687 (11th Cir. 2019). Both are distinguishable from the present case.

In *Knox*, the African-American plaintiff got into a violent altercation outside of work with his adult daughter, another employee of the defendant. The defendant suspended the plaintiff without pay and told him he could keep his job if

he completed anger management classes while on unpaid leave. The plaintiff proffered three white comparators who he alleged were treated less harshly. The first comparator was Ingram, a white employee who was not disciplined after a domestic violence incident with his wife, a non-employee. The other comparators were Warner and Cruce, also white employees who got into a violent altercation with one another at work. Warner and Cruce were terminated but then rehired out of business necessity, and they were permitted to work while attending anger management classes. The Eleventh Circuit concluded that Ingram was not similarly situated to the plaintiff in all material respects: "although he was involved in a domestic violence incident outside work, the altercation did not involve one of [defendant's] employees." *Id.* at 1247. The court reached the same conclusion as to Warner and Cruce but for different reasons. It reasoned that "[t]he facts of [Warner's and Cruce's] immediate termination and subsequent rehiring out of necessity undermine [plaintiff's] claim both that they had been treated less harshly—indeed, they were both immediately fired—and that they were similarly situated in all material respects." *Id.* at 1248.

In *Hartwell*, the plaintiff firefighter, a black male, was fired due to chronic tardiness. The plaintiff's proffered comparator was a white firefighter who was also frequently late but was not fired. The court concluded that the comparator

was different in two material respects. *Hartwell*, 792 F. App'x at 694. First, the comparator worked on a different shift and had a different immediate supervisor. "This difference [was] especially significant here, where [plaintiff] claims that his immediate supervisor . . . was the discriminatory actor." *Id.* Second, the evidence showed that the comparator was late to work "much less frequently" than the plaintiff. *Id.* Testimony established that the plaintiff was late "almost every shift" and substantially more than any other firefighter, including the comparator. *Id.* Additionally, the comparator's timeliness improved after he was counseled about his tardiness. Accordingly, because the comparator had a different supervisor and his conduct was "significantly less egregious than [plaintiff's]," he was not similarly situated in all material respects. *Id.*

Neither of these cases suggest to the Court that it erred in concluding that Scales and Humphries were similarly situated. Both Scales and Humphries allegedly engaged in the same basic misconduct. Both allegedly used the "n" word while at work. And TMS does not mention that Humphries used the "n" word a second time after management told him it was offensive. Viewing the facts and all reasonable inferences in Scales's favor, this Court cannot conclude that Humphries's use of the "n" word was "significantly less egregious" than Scales's.

### B. Pretext

TMS also argues that summary judgment is due to be granted because, based on Steven Drexler's expert report, no reasonable jury could conclude that Carroll lacked a good faith belief that Scales wrote the note at the time of his termination. Because all versions of the Drexler's report contained a statement that Scales's handwriting sample was inconsistent with the note, Scales insists that a reasonable jury could disbelieve TMS's claim that they relied on it to terminate him. Scales also points to evidence that, after Scales was terminated, Carroll told Billy Brown, a TMS supervisor, that he did not believe Scales wrote the note. (Doc. 32-3 at 2, Aff. of Billy Brown.) Although Scales raises this specific argument for the first time, the affidavit was part of Scales's evidentiary submission attached to his response brief in opposition to TMS's motion for summary judgment. Accordingly, the Court finds it appropriate to consider such evidence in deciding the motion to reconsider.

As the Court explained in its summary judgment order:

> [A] reasonable jury could disbelieve TMS's explanation that it terminated Scales because of Drexler's expert opinion because all versions of the written opinion contained language exonerating Scales, i.e., the statement that Scales's handwriting sample was inconsistent with the note. Although the report also contains statements inculpating Scales, the existence of conflicting statements implies that one of them is incorrect. Additionally, although Drexler testified that he also verbally told Burkey that Scales wrote the note, neither Burkey nor Carroll testified that they relied *only* on Drexler's verbal report or

that they did not read the written versions in reaching the decision to terminate Scales.

(Doc. 46 at 17 (footnote omitted).) Nor did Burkey or Carroll testify that they noticed the conflicting statements in Drexler's written report but believed that the language exonerating Scales was likely a typo.

Moreover, Billy Brown's affidavit is additional evidence that would allow a reasonable jury to disbelieve TMS's proffered reason for terminating Scales. TMS argues that the affidavit "does not state when that alleged conversation took place and, therefore, is not evidence as to Carroll's state of mind at the time of Scales's termination." (Doc. 54 at 4.) From context, it is reasonable to infer that the alleged conversation took place after Scales was terminated. But the timing does not foreclose the possibility that Carroll's alleged statement was reflective of his state of mind at the time of Scales's termination. If, as Billy Brown claims, Carroll stated that he did not believe Scales wrote the note after Scales was terminated, it is reasonable to infer that Carroll also held such a belief *before* Scales was terminated. Accordingly, Scales proffered sufficient evidence of pretext to survive summary judgment, and TMS's motion to reconsider is due to be denied.

### III. Conclusion

For the reasons stated above, TMS's motion to reconsider is hereby DENIED.

**DONE** and **ORDERED** on August 5, 2020.

                                                      L. Scott Coogler
                                     United States District Judge

199335